**United States District Court**
For the Northern District of California

1
2
3
4
5
6          IN THE UNITED STATES DISTRICT COURT
7          FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
9    WALNUT CREEK MANOR, LLC,
10             Plaintiff,
11      v.
12   MAYHEW CENTER, LLC; and DEAN DUNIVAN,
13             Defendants.
14   ─────────────────────────────────────
15   MAYHEW CENTER, LLC; and DEAN DUNIVAN,
16             Cross-Claimants,
17      v.
18   WALNUT CREEK MANOR, LLC,
19             Cross-Defendant.
20   _____/
21
22

No. C 07-05664 CW

ORDER GRANTING IN
PART WALNUT CREEK
MANOR'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT AND
GRANTING IN PART
MAYHEW CENTER'S AND
DUNIVAN'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT

    This case presents competing claims under the Comprehensive
Environmental Response, Compensation, and Liability Act (CERCLA).
Plaintiff Walnut Creek Manor (WCM) filed a motion for partial
summary judgment.  Defendants Mayhew Center (MC) and Dean Dunivan
oppose the motion and filed a cross-motion for partial summary
judgment.  The motions were heard on March 19, 2009.  Having
considered all of the parties' papers and argument on the motions,

the Court hereby grants Plaintiff's motion in part and grants Defendants' motion in part.

BACKGROUND

This case involves a dispute between two adjacent landowners, Walnut Creek Manor (WCM) and Mayhew Center (MC), over the source of soil and groundwater contaminated by tetrachlorethylene (PCE).  In operation since 1964, WCM is a seniors-only residential apartment complex with approximately 420 units.  Eberle Decl. ¶¶ 4-5.  Before that time, the site was a walnut orchard.  Id.  Bordering WCM to the east, lies MC, which was first developed in the 1970s as part of an industrial development district and has since been occupied by a variety of known and unknown commercial and light industrial entities.  Kelly Decl., Exh. L at 10-11.  In the 1970s and 1980s, at least one tenant at MC, Etch-Tek, was in a business involving the manufacturing of printed circuit or wiring boards and plating. Id.  During the time Etch-Tek operated at MC, solvent use, including PCE, was prevalent in the printed circuit board manufacturing industry.  Kelly Decl., Exh. K at 2.  Kenneth Beard, an owner of Etch-Tek, stated that it did not use PCE or any solvents in its operation.  K. Beard Dep. at 166:1-6.

In 1993, Dean Dunivan purchased the MC property out of foreclosure from the San Francisco Federal Bank.  Dunivan Dep. at 25:4-12.  Before Dunivan purchased the property, the bank commissioned an investigation of the site.  The purpose of the report was to determine "whether absestos containing materials are present in the building and to indirectly assess the potential for other environmental concerns."  Kelly Decl., Exh. H.  The report concluded that asbestos was located in all buildings.  Id.  The

**United States District Court**
For the Northern District of California

report also noted that limited quantities of hazardous materials were present at the property, including: toners for copier machines; chemical developers for photography; lubricants and petroleum-based solvents stored at a print shop at 3321 Vincent; and adhesives stored on the roof. <u>Id.</u> "Direct evidence of hazardous materials release was not observed during our work." <u>Id.</u> The report contained the following caveat, "This inspection and report is limited in scope to the visual observations existing at the time of the inspection. No special tests were conducted on any building element with the exception of the asbestos sampling and no building elements were removed to reveal any suspected conditions that may be existing." <u>Id.</u> Before the purchase, Dunivan did not perform any soil or groundwater tests or hire any professionals, other than termite inspectors, to inspect the property. <u>Id.</u> at 34:1-15; 39:17-40:2.

In 2004, Dunivan sought to refinance the MC property. Before committing to the refinance, the bank required a Phase I environmental review, which was performed by National Assessment Corporation (NAC). NAC noted that between 1973 and 1981, Etch-Tek received numerous violation notices from the city fire department regarding the improper storage of hazardous materials. Kelly Decl., Exh. I at 27. "However, there is no evidence that releases to soil or groundwater resulted from this storage. Additionally, specific reference to chlorinated solvents were not identified in Fire Department Records." <u>Id.</u> NAC recommended that "additional soil and groundwater data would be required in order to determine if former Property activities have contributed to soil and groundwater contamination at the Property and in the immediate

3

United States District Court
For the Northern District of California

1    vicinity." <u>Id.</u>

2        Dunivan then hired an environmental engineering company,

3    Allwest Assoc., to review the NAC's conclusion that further testing

4    was required.  Dunivan Dep. at 122:11-15.  Allwest reviewed the NAC

5    report and environmental reports for the former Union Pacific

6    Railroad Hookston Station site located to the northeast and east of

7    MC.  Allwest's report sought "to identify potential environmental

8    impacts to the subject Mayhew Center property from off-site

9    sources, and to determine whether past or present occupants of the

10   Mayhew Center property may have environmentally impacted off-site

11   properties."  Kelly Decl., Exh. J at 1.  The Allwest report

12   concluded that "the potential source of PCE contamination of the

13   groundwater would in all likelihood be the [sic] located well north

14   of the Mayhew Center property, where the highest concentrations of

15   PCE were detected." <u>Id.</u> at 5.  The report made no mention of WCM,

16   MC's neighbor to the west.  The report ultimately concluded that

17   further "subsurface investigation at the subject property is not

18   warranted." <u>Id.</u>

19       In December, 2004, the California Regional Water Quality

20   Control Board (Regional Board) ordered MC and WCM to submit a

21   technical report proposing a site investigation work plan to assess

22   the soil and groundwater quality at their respective properties and

23   a time schedule to perform the investigation.  Kelly Decl., Ex. V.

24   To date, MC has not obtained any soil or groundwater samples

25   pursuant to a work plan approved by the Regional Board.  Dunivan

26   Dep. at 144:9-14.

27       In contrast, on May 20, 2005, WCM submitted to the Regional

28   Board a report that evaluated multiple soil and groundwater samples

                                    4

United States District Court
For the Northern District of California

obtained from eight boreholes drilled to sixty foot depths below
the ground surface on the WCM property and three boreholes drilled
to sixty foot depths below the ground surface on the MC property
near the boundary line between the properties.  Eberle Decl., Exh.
F at 10-11.  The eight boreholes drilled on WCM property revealed
no detectable concentration of PCE.  Id. at 10-12.  The samples
obtained from all three boreholes drilled on the MC property
contained detectable PCE contamination.  Id.  On July, 29, 2005,
the Regional Board requested a follow-up subsurface investigation
of the WCM property.  Eberle Decl. ¶ 25.  On December 16, 2005, WCM
submitted a report that noted detectible PCE concentrations in the
soil immediately adjacent to the WCM boudary with MC, but at
concentrations lower on the WCM side of the property line than the
concentrations found on the MC property.  Id., Ex. I at 4, 6-7.
The report concluded that "analytical data from April and November
2005 soil samples suggest that the potential source is located near
boring B7 on Mayhew Center."  Id. at 6.  The report also stated
that the "soil data evaluated for their report suggest that Walnut
Creek Manor is not a source of PCE contamination."  Id.

On December 14, 2006, the Regional Board requested that WCM
provide further site history information and a work plan to perform
a third soil and groundwater investigation.  Eberle Decl. ¶¶ 30-31.
On January 26, 2007, WCM submitted a site history and work plan,
but the Regional Board rejected it.  Eberle Decl., Exh. N.  WCM is
currently appealing that decision.

On April 3, 2008, WCM served a Rule 34 request to enter MC's
property to conduct soil and groundwater testing to obtain further
data.  The testing found two sources of PCE on the MC property in

5

shallow soil, "including a substantial source area located
approximately 11 feet from the western property boundary with
Walnut Creek Manor."  Eberle Decl., Exh. O at 13.  The report,
written by WCM's environmental expert Scott Warner, concluded that
"this PCE-source area has substantially impacted the Walnut Creek
Manor property."  Id.

     WCM has sued MC for (1) CERCLA cost recovery, (2) CERCLA
contribution, (3) federal declaratory relief, (4) private nuisance,
(5) public nuisance, (6) trespass, (7) negligence, (8) negligence
per se, (9) strict liability, (10) indemnity pursuant to the
Hazardous Substances Control Account Act, (11) indemnity under the
Porter-Cologne Act and (12) equitable indemnity.  MC has filed a
cross claim for (1) CERCLA cost recovery, (2) CERCLA contribution,
(3) federal declaratory relief, (4) public nuisance, (5) private
nuisance, (6) negligence, (7) waste, (8) indemnity pursuant to the
Hazardous Substance Control Account Act, (9) indemnity under the
Porter-Cologne Act, (10) equitable indemnity and (11) attorneys'
fees.

                          LEGAL STANDARD

     Summary judgment is properly granted when no genuine and
disputed issues of material fact remain, and when, viewing the
evidence most favorably to the non-moving party, the movant is
clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);
Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.
1987).

     The moving party bears the burden of showing that there is no
material factual dispute.  Therefore, the Court must regard as true

the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289.  The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the

United States District Court
For the Northern District of California

7

moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a <u>prima facie</u> showing in support of its position on that issue.  <u>UA Local 343 v. Nor-Cal Plumbing, Inc.</u>, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  <u>Id.</u>  Once it has done so, the non-moving party must set forth specific facts controverting the moving party's <u>prima facie</u> case.  <u>UA Local 343</u>, 48 F.3d at 1471.  The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible."  <u>Id.</u>  This standard does not change merely because resolution of the relevant

United States District Court

For the Northern District of California

1    issue is "highly fact specific."   Id.

2                            DISCUSSION

3         WCM seeks partial summary judgment against MC as to liability

4    under CERCLA and as to its affirmative defenses, but does not move

5    for summary judgment on MC's liability for the non-CERCLA causes of

6    action.  WCM also seeks summary judgment on MC's entire cross-

7    claim.  MC opposes WCM's motion and moves for partial summary

8    judgment on all of the non-CERCLA causes of action in WCM's first

9    amended complaint.  MC does not move for summary judgment on its

10   cross claims.

11   I.   WCM's Claims Against MC

12        A.   CERCLA

13        CERCLA "generally imposes strict liability on owners and

14   operators of facilities at which hazardous substances were

15   disposed."   3550 Stevens Creek Assocs. v. Barclays Bank, 915 F.2d

16   1355, 1357 (9th Cir. 1990).  To that end, CERCLA "authorizes

17   private parties to institute civil actions to recover the costs

18   involved in the cleanup of hazardous wastes from those responsible

19   for their creation."   Id.

20            To prevail in a private cost recovery action, a
             plaintiff must establish that (1) the site on which
21           the hazardous substances are contained is a "facility"
             under CERCLA's definition of that term, Section
22           101(9), 42 U.S.C. § 9601(9); (2) a "release" or
             "threatened release" of any "hazardous substance" from
23           the facility has occurred, 42 U.S.C. § 9607(a)(4);
             (3) such "release" or "threatened release" has caused
24           the plaintiff to incur response costs that were
             "necessary" and "consistent with the national
25           contingency plan," 42 U.S.C. §§ 9607(a)(4) and
             (a)(4)(B); and (4) the defendant is within one of four
26           classes of persons subject to the liability provisions
             of Section 107(a).

27

28   Stevens Creek, 915 F.2d at 1358.  Title 42 U.S.C. § 9607(a) defines

United States District Court
For the Northern District of California

those four categories of potentially responsible parties (PRPs) as follows:

> (1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

The parties do not dispute that (1) MC is a facility as defined in § 9601(9)(B), (2) MC is a PRP because it owns and operate the MC property, 42 U.S.C. § 9607(a)(1) and (3) PCE exists on both the MC and WCM properties.  However, the parties dispute the source of the release of PCE and whether that release caused either party to incur response costs that were necessary and consistent with the national contingency plan.

CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).  WMC argues that the mere presence of a hazardous substance at MC's facility constitutes a "release" from that facility.  United States v. Honeywell Intern., Inc., 542 F. Supp. 2d 1188, 1198 (E.D. Cal. 2008); United States v. Domenic Lombardi Realty, Inc., 204 F. Supp. 2d 318, 330 (D.R.I. 2002) ("a number of courts have held that the presence of hazardous material at a site is sufficient to constitute a 'release' for purposes of triggering

10

CERCLA liability"); <u>Foster v. United States</u>, 992 F. Supp. 642, 651 (D.D.C. 1996).  The Ninth Circuit has not adopted this broad position.  Further, none of the cases WCM cites concern adjacent landowners who each assert that the other party was the source of the release.

WCM also argues that a release of PCE must have originated from MC because greater concentrations of PCE exist at the higher elevation MC property compared to the lower elevation WCM property. Eberle Decl., Ex. O.  And WCM argues that MC caused a release when, without WCM's permission, it drilled a slant boring from MC property onto WMC property.  WCM's expert, Scott Warner, opined that performing an "angled boring from MC to WCM through an area with PCE . . . provides a continuing preferential pathway for contaminants, including PCE, to be transported from the higher elevation MC property to the lower elevation WCM property."  Kelly Decl., Exh. L at 20.  This evidence, independently and together, is sufficient to raise a dispute of fact as to the occurrence of a "release" as defined by § 9601(22).  Warner's reports show that PCE has at least "escaped" or "leeched" from MC property onto WCM property.

MC counters that none of this evidence should be considered by the Court because it consists of unreliable and irrelevant scientific conclusions.  MC argues that Warner's conclusions regarding MC as a possible source of PCE contamination were "premised on nothing more than his assumptions without any objective scientific support."  Opposition at 10.

The test for admissibility of expert testimony under <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), and <u>Kumho Tire</u>

Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), is whether the opinion the expert seeks to offer is relevant and reliable. This determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592. MC argues that Warner improperly used the process-of-elimination method to determine that the PCE present on the WCM property came from the MC property. Specifically, MC asserts that Warner improperly excluded WCM as a source of the contamination. MC claims it is just as likely that WCM was the source because (1) the asphalt at WCM was not impermeable to PCE, (2) many household ingredients which may have been used at WCM contain PCE and (3) vehicles were occasionally repaired on the WCM property and some products used in vehicle repair contain PCE. MC also faults Warner for making his conclusions without evidence that any of MC's former tenants used PCE.

The Court has reviewed Warner's expert reports and concludes that they are grounded in a defensible scientific methodology and based on extensive factual support. MC is correct that Warner's reports did not explicitly discuss the speculative factors mentioned above and why they did not compel the conclusion that PCE flowed from WCM to MC. However, Warner need not mention every speculative theory when describing his methodology. As Warner described, "the mere possibility or speculation that PCE may have been contained in unknown products and in unknown concentrations [on WCM property] is irrelevant when the subsurface data obtained and evaluated in conformance with professional standards does not

support a PCE source from the Walnut Creek Manor property."  Warner Reply Decl. ¶ 9.

Warner performed extensive subsurface testing on both the MC and WCM properties, reviewed photographs of the areas, considered historical information for both MC and WCM properties that describes site use and assessed information provided in deposition testimony and previous environmental reports.  The extensive soil testing uncovered evidence that (1) PCE has only been detected in the WCM soil along the MC property line, (2) PCE concentrations on the MC property are far greater than those on the WCM property in adjacent areas and (3) the WCM property is at a lower elevation than the MC property, but PCE in the soil at the MC property exists at elevations at and even above the ground surface level of the WCM property.  Warner has demonstrated, with scientifically sound methodology, that a pathway existed for the movement of PCE from MC to WCM.[1]

MC also asks the Court to exclude Warner's testimony because he has submitted contradictory testimony.  MC argues that in Warner's deposition, he testified that PCE contamination moved laterally over the surface of MC's land "into the unpaved area" and onto the WCM property; but in a later declaration, he stated that PCE moved through "the soil column and vadose zone pore space."  Warner Decl. ¶ 7.  These two statements are not contradictory.

[1]MC also argues that the opinions of WCM's expert Joseph Odencrantz are inadmissible because (1) WCM did not provide MC with his expert report as required under Federal Rule of Civil Procedure 26 and (2) WCM claimed that Odencrantz's work product was privileged, refused to allow MC to depose him, but now offers his testimony.  WCM does not contest these points in its reply brief.  At the hearing on these motions, the parties agreed not to rely on Odencrantz's expert opinions.

United States District Court
For the Northern District of California

When analyzed in context, the two statements complement each other. There is nothing in the evidence to suggest that PCE cannot travel both horizontally across the surface of MC's land and through the soil.

MC argues that even if Warner's testimony is admissible, WCM has not established that a release of PCE came from MC and migrated to WCM. In <u>Castaic Lake Water Agency v. Whittaker Corp.</u>, 272 F. Supp. 2d 1053, 1066 (C.D. Cal. 2003), the court stated that

> in a two-site CERCLA case, the plaintiff meets its burden on summary judgment if it (a) identifies contaminant at its site, (b) identifies the same (or perhaps a chemically similar) contaminant at the defendant's site, and (c) provides evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site. If the plaintiff meets this burden, the defendant must proffer evidence sufficient to create a genuine issue of fact as to its ability to disprove causation.

MC argues that there is a material factual dispute as to whether anyone at MC ever possessed PCE. Neither party has come forward with direct evidence that persons on MC's property used PCE. The circumstantial evidence of PCE use on MC's property consists of (1) WCM's environmental studies and (2) the fact that a company once located on MC's property, Etch-Tek, was in a business that typically used PCE, although the owner of Etch-Tek testified that he never used PCE.

Moreover, MC presents expert testimony that the source of PCE is WCM, not MC. MC's expert, Jan Schutze, states that "PCE concentrations consistently increased with depth, suggesting contamination from a lateral source or sources. Based on the currently available evidence, these up-gradient sources are on the WCM property." Schutze Decl., Exh. 1. MC argues that the PCE

14

**United States District Court**
For the Northern District of California

traveled through the groundwater along a down-gradient pathway. Opposition at 20.  Schutze noted that maintenance shops and storage areas formerly located near where PCE was discovered on WCM's property could be the source of the contaminant.  Id.  Schutze also estimated that the quantity of PCE present in the soil amounts to one to two gallons, which "is typical for residential applications such as carpet or fabric cleaning, automotive parts cleaning and HVAC equipment servicing."  Id.

WCM counters that Schutze's conclusions are not supported by specific facts and moves to exclude his testimony under Daubert. MC presents no evidence that the groundwater beneath WMC is contaminated with PCE, let alone at concentrations significant enough to result in the substantially higher soil and groundwater contamination present on the MC property.  However, the fact that the groundwater has not been tested on WCM's property does not mean that Schutze should not be heard to opine that the contamination travelled from WCM property via groundwater.  Schutze reviewed soil and groundwater samples taken from the MC property and noted that the fact that PCE has been detected in the soil of the up-gradient WCM property as far as twenty feet west of the property line strongly suggests that the contaminant has reached the groundwater below and traveled to MC property.  Schutze Reply Decl. ¶ 6. Schutze relied on the same facts as those relied upon by WCM's expert, Warner.  It also appears that they use similar methodologies.  The difference between them is their conclusions. The Court concludes that neither expert is excluded under Daubert. Both offer relevant and reliable opinions based on sound scientific

United States District Court

For the Northern District of California

methodologies.[2]  Therefore, a triable issue of fact exists as to the source of the PCE contaminant.[3]

B.    Recoverable Remedial Costs

To prevail on its summary judgment motion on its CERCLA claims, WCM has the burden to prove that its response cost is both necessary and consistent with the national contingency plan.  42 U.S.C. § 9607(a)(4)(B); Carson Harbor Village, Ltd. v. Unocal Corp., 287 F. Supp. 2d 1118, 1153-54 (C.D. Cal. 2003).  MC argues that WCM fails to establish that it has any recoverable remedial costs because all of its costs are litigation costs.

MC relies primarily on Key Tronic Corp. v. United States, 511 U.S. 809 (1994), and Young v. United States, 394 F.3d 858 (10th Cir. 2005).  In Key Tronic, the Supreme Court considered the extent to which private corporations that incurred cleanup costs under CERCLA could collect litigation-related attorneys' fees.  The Court held that "some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself."  As an example, the Court noted that "tracking down other responsible solvent polluters" would be recoverable because such

_____

[2]In WCM's reply brief, it moves to exclude Christopher Vais's expert opinions because he testified that he is not an expert in issues concerning vertical or lateral movements of contaminants in soil.  Vais Dep. at 43.  MC does not dispute this and notes that Vais will not offer his opinions on this issue.  Supp. Vais. Decl. ¶ 2.  WCM also argues that Vais's opinions are unsupported by any credible evidence.  However, like Schutze and Warner, Vais grounded his opinions in test data from both the MC and WCM properties.  Vais's testimony about the source of PCE contamination is relevant and reliable and is admissible under Daubert.

[3]To the extent the Court relied upon evidence to which MC objected, the objections are overruled.  To the extent the Court did not rely on such evidence, MC's objections are overruled as moot.

16

**United States District Court**
For the Northern District of California

efforts "significantly benefitted the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." Key Tronic, 511 U.S. at 820.  However, pure litigation expenses, such as "legal services performed in connection with negotiations between Key Tronic and the EPA that culminated in the consent decree" are not recoverable because they "do not constitute 'necessary costs of response'."   Id.

MC asserts that both of the experts WCM hired performed work solely to identify MC as the source of PCE for this litigation and not as part of any plan to clean up the contamination.  However, as the Supreme Court explained, studies conducted in an effort to "track[] down other responsible solvent polluters" are recoverable under CERCLA.  WCM's costs are preliminary efforts to investigate the site and the extent to which the site is polluted in order to make recommendations for future remediation action.  That these studies also further WCM's current litigation is irrelevant.

In Young, the plaintiffs purchased property "at a substantially reduced price, adjacent to a superfund cite." 394 F.3d at 860.  They subsequently discovered hazardous substances on their property, but instead of taking action to contain or clean up those substances, they sued the federal government and the city government under CERCLA.  Id.  The court held that the plaintiffs' costs were not necessary to the containment and cleanup of hazardous releases on their property.  Id.  The court noted, "Recognized costs cannot be deemed 'necessary' to the containment and cleanup of hazardous releases absent some nexus between the alleged response cost and an actual effort to respond to environmental contamination."  The court held that the plaintiffs'

17

alleged response costs were not "'necessary' to the containment or cleanup of hazardous releases because the costs were not tied in any manner to the actual cleanup of hazardous releases."  The plaintiffs repeatedly testified that they did not intend to spend any money to clean up the contamination on their property.

Unlike the plaintiffs in <u>Young</u>, WCM has not testified that it does not intend to spend any money to clean up the contamination on its property.  It seeks to recover response costs for work performed in order to assist with and help plan the eventual remediation and cleanup efforts.  First Amended Complaint ¶ 33; Eberle Decl. ¶¶ 20, 21, 25, 29, 31-39; Warner Decl. ¶¶ 2-5.  WCM has expressed no intention to abandon its property like the plaintiffs did in <u>Young</u>.  Eberle Decl. ¶ 5-8.  The Court concludes that the cost of the studies performed by WCM is a necessary response cost.

MC also argues that WCM's response costs are inconsistent with the national contingency plan (NCP) because (1) WCM's actions have not resulted in a CERCLA-quality cleanup, and (2) WCM's site investigation is insufficient.

The NCP provides that a private cleanup effort will be "considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements [in 40 C.F.R. §  300.700(c)(5)-(6)],[4] and results in a

---

[4]These sections provide,
    (5) The following provisions of this Part are potentially applicable to private party response actions:
        (i) Section 300.150 (on worker health and safety);
        (ii) Section 300.160 (on documentation and cost recovery);

(continued...)

United States District Court
For the Northern District of California

CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(I). A CERCLA-quality cleanup is (1) "protective of human health and the environment," (2) utilizes "permanent solutions and alternative treatment technologies or resource recovery technologies," (3) is cost-effective, and (4) is selected after "meaningful public

---

[4](...continued)
        (iii) Section 300.400(c)(1), (4), (5), and (7) (on determining the need for a Fund-financed action); (e) (on permit requirements) except that the permit waiver does not apply to private party response actions; and (g) (on identification of ARARs) except that applicable requirements of federal or state law may not be waived by a private party;
        (iv) Section 300.405(b), (c), and (d) (on reports of releases to the NRC);
        (v) Section 300.410 (on removal site evaluation) except paragraphs (f)(5) and (6);
        (vi) Section 300.415 (on removal actions) except paragraphs (a)(2), (b)(2)(vii), (b)(5), and (g); and including § 300.415(j) with regard to meeting ARARs where practicable except that private party removal actions must always comply with the requirements of applicable law;
        (vii) Section 300.420 (on remedial site evaluation);
        (viii) Section 300.430 (on RI/FS and selection of remedy) except paragraph (f)(1)(ii)(C)(6) and that applicable requirements of federal or state law may not be waived by a private party; and
        (ix) Section 300.435 (on RD/RA and operation and maintenance).
(6) Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements. The following provisions of this part regarding public participation are potentially applicable to private party response actions, with the exception of administrative record and information repository requirements stated therein:
        (i) Section 300.155 (on public information and community relations);
        (ii) Section 300.415(n) (on community relations during removal actions);
        (iii) Section 300.430(c) (on community relations during RI/FS) except paragraph (c)(5);
        (iv) Section 300.430(f)(2), (3), and (6) (on community relations during selection of remedy); and
        (v) Section 300.435(c) (on community relations during RD/RA and operation and maintenance).

United States District Court
For the Northern District of California

participation."  55 Fed. Reg. 8793.  "Immaterial or insubstantial deviations" from the NCP will not preclude a cost-recovery action. 40 C.F.R. § 300.700(c)(4).

WCM does not claim that it has performed a CERCLA-quality cleanup or that its site investigation is sufficient as is. Rather, WCM argues that it does not have to perform these activities to be "consistent" with the NCP because all of its efforts thus far "will undoubtedly play a significant role in the election of a remediation effort."[5]  Reply at 11.  The clear language of the NCP reveals that a plaintiff cannot collect costs when it has performed some of the NCP requirements.  By merely performing a few investigations of a hazardous site, WCM has not "substantially complied" with the entirety of the NCP.  Moreover, because a CERCLA-quality cleanup has not even begun, WCM cannot carry its burden to show that its efforts have "result[ed] in a CERCLA-quality cleanup."  WCM's response costs are not "consistent" with the NCP.  However, the Court notes that these costs may be recoverable when the cleanup is completed and WCM shows that it substantially complied with the NCP.

C.   MC's Affirmative Defenses under CERCLA

WCM moves for summary judgment on MC's claim that it is protected from liability under CERCLA by the third party defense. Section 9607(b)(3) states, "There shall be no liability" for a "person otherwise liable who can establish by a preponderance of the evidence that the release or threatened release and the damages

---

[5]WCM does not cite any Ninth Circuit cases to support this argument, and the out-of-circuit district court cases that WCM relies on are inapposite.

United States District Court
For the Northern District of California

resulting therefrom were caused solely by . . . an act or omission of a third party . . . if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned . . . and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions." To invoke the defense, MC must also show that, at the time it acquired the property, it "did not know and had no reason to know that any hazardous substance" was disposed of on, in or at the facility. 42 U.S.C. § 9601(35)(A)(ii). To establish that it had no reason to know of the hazardous substance, MC must be able to show that before it purchased the facility it "carried out all appropriate inquiries . . . into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices." Id. § 9601(35)(B)(i). MC must also have taken "reasonable steps to stop any continuing release; prevent any threatened future release; and prevent or limit any human, environmental, or natural resource exposure to any previously released hazardous substance." Id.

According to MC, the third party is WCM. As noted above, a triable issue of fact exists as to the source of the PCE release; therefore a triable issue of fact exists as to whether WCM is the "sole" cause of PCE contamination.

WCM asserts that MC does not have any evidence that MC took reasonable steps to stop any continuing release, prevent any threatened future release, or prevent or limit exposure of previously released PCE to carry its ultimate burden of persuasion at trial. The Court agrees.

21

Dunivan testified that he took no effort in this regard:

| Question: | You are aware that there is PCE in the soil and in the groundwater beneath Mayhew Center property; is that correct? |
|---|---|
| Dunivan: | That's correct. |
| Question: | Have you taken any actions to cease or abate any movement of that PCE associated with its presence? |
| Dunivan: | Other than working with the [Regional] board? No. |
| Question: | What have you done working with the board to see that PCE no longer has migrated through soil or groundwater? |
| Dunivan: | Nothing. |
| Question: | Have you taken any steps to prevent or limit any human or environmental exposure to the PCE that's been detected at the Mayhew Center cite? |
| Dunivan: | No, I don't believe so. |

Instead, MC bases its third party defense on the fact that, before Dunivan purchased the MC property out of foreclosure from the San Francisco Federal Bank, the bank commissioned an environmental assessment to determine the presence of any environmental contaminants. The assessment report noted the presence of asbestos in all of the buildings on the property, but did not mention PCE. However, the report stated that it did not purport to be a complete environmental review and did not even completely examine the current uses of the property, let alone any past uses of the property. Moreover, Dunivan knew of the limitations of the report, but did not take any action to fill those gaps. Therefore, the Court concludes that MC has failed to set forth evidence to support the elements of a third party defense. The Court grants summary adjudication for WCM on MC's affirmative defense under 42 U.S.C. § 9607(b)(3).

D.   WCM's Motion for Summary Judgment on MC's claims

WCM moves for summary judgment on MC's cross-claims. With respect to MC's CERCLA cross-claims, a triable issue of fact exists as to the source of the PCE contamination, as noted above.

Notwithstanding this fact, WCM argues that MC's CERCLA cross-claims must be dismissed because MC has not produced any specific evidence that its response costs are necessary and consistent with the NCP. However, as the parties agreed at the hearing on these motions, the issues regarding response costs will be determined at a later date. The CERCLA issue currently before the Court is the source of PCE contamination. Therefore, the Court denies WCM summary judgment on MC's CERCLA cross-claims.

WCM also argues in the alternative that it is protected by the third party defense. WCM asserts that the presence of PCE on its property was caused solely by a third party, MC. See 42 U.S.C. § 9607(b)(3). However, a triable issue of fact exists as to whether MC is the "sole" cause of PCE contamination. Therefore, the Court denies summary adjudication for WCM on its affirmative defense.

With respect to MC's state law cross-claims, WCM tersely argues that none of them survive summary judgment because MC "provided no credible evidence that the PCE has migrated from the [WMC] property to the MC property." Reply at 19. WCM argues that without such evidence, MC cannot establish the causation or damages elements on its state law cross-claims. However, as noted above, MC has created a triable issue of fact as to the source of the PCE. Therefore, the Court denies WCM's motion for summary judgment on all of MC's state law cross-claims.[6]

E.    MC's Motion for Summary Judgment on WCM's State Law Claims

MC similarly argues that none of WCM's state law claims

_____

[6]At the hearing, the parties agreed to dismiss their respective causes of action for contribution under the Porter-Cologne Act.

survive summary judgment because WCM cannot prove causation for any
of the claims.  Because there is a triable issue of fact on this
issue, the Court denies MC's summary judgment motion on this
ground.

MC argues that WCM's claims for public and private nuisance
and trespass do not survive summary judgment for additional
reasons.  Nuisance is defined as "anything which is injurious to
health . . . or is indecent or offensive to the senses, or an
obstruction to the free use of property, so as to interfere with
the comfortable enjoyment of life or property."  Cal. Civ. Code
§ 3479.

> Although the central idea of nuisance is the
> unreasonable invasion of this interest [in the use and
> enjoyment of property] and not the particular type of
> conduct subjecting the actor to liability, liability
> nevertheless depends on some sort of conduct that
> either directly and unreasonably interferes with it or
> creates a condition that does so.  The invasion may be
> intentional and unreasonable.  It may be unintentional
> but caused by negligent or reckless conduct; or it may
> result from an abnormally dangerous activity for which
> there is strict liability.  On any of these bases the
> defendant may be liable.  On the other hand, the
> invasion may be intentional but reasonable; or it may
> be entirely accidental and not fall within any of the
> categories mentioned above.  In these cases there is no
> liability.

Gdowski v. Louie, 84 Cal. App. 4th 1395, 1408 (2000).  "The essence
of the cause of action for trespass is an 'unauthorized entry' onto
the land of another.  Such invasions are characterized as
intentional torts, regardless of the actor's motivation."  Civic
Western Corp. v. Zila Industries, Inc., 66 Cal. App.3d 1, 16
(1977).

MC argues that it cannot be held liable for these causes of
action absent a showing that it was an active participant in

24

causing the PCE contamination.  Resolution Trust Corp. v. Rossmoor Corp., 34 Cal. App. 4th 93, 99-100 (1995).  WCM has presented evidence that MC drilled a slant boring from the MC property to the WCM's property, which may have created a pathway for the migration of PCE onto WCM's property.  The evidence of this action is sufficient to create a material dispute as to MC's liability for nuisance and trespass.

MC additionally asserts that WCM has plead only a continuing nuisance, not a permanent one.  An important difference between the two is in the allowable damages.  In a permanent nuisance case, "the law considers the wrong to be completed at the time of entry and allows recovery of damages for past, present, and future harm in a single action, generally the diminution in the property's value."  Starrh and Starrh Cotton Growers v. Aera Energy, LLC, 153 Cal. App. 4th 583, 592 (2007).  In a continuing nuisance case, "damages are assessed for present and past damages only; prospective damages are not awarded because the trespass may be discontinued or abated at some time, ending the harm."  Id.  Though WCM does not use the term "permanent nuisance" in its complaint, it seeks damages for "a decrease and diminution in the value" of WCM's property and damages "due to the stigma caused by the contamination of the surface and subsurface soil."  FAC ¶ 50.  Therefore, the Court finds that MC was on notice that WCM plead both continuing and permanent nuisance theories of liability.

MC next argues that WCM's continuing nuisance cause of action fails because WCM cannot prove damages for this claim.  MC relies on Mangini v. Aerojet Corp., 12 Cal. 4th 1087 (1996).  In that case, the court discussed the type of damages evidence a plaintiff

United States District Court
For the Northern District of California

must proffer to demonstrate that a nuisance is continuing and thus not subject to the three year statute of limitations applicable to permanent nuisances.  The court held that, because the "plaintiffs had failed to present <u>any</u> substantial evidence that the contamination of their land as a result of defendant['s] . . . practice of dumping and burning a toxic solvent was capable of being abated at a reasonable cost, the nuisance must be deemed permanent."  <u>Id.</u> at 1090 (emphasis in original).  Therefore, the court applied the three year statute of limitations reserved for a permanent nuisance and concluded that the plaintiff's nuisance claim was time-barred.  <u>Id.</u>  MC asserts that <u>Mangini</u> stands for the proposition that, to survive summary judgment, WCM must support its continuing nuisance claim with evidence that the contamination on WCM's site is reasonably abatable.  However, the holding of <u>Mangini</u> does not apply outside of the statute of limitations context.  The court specifically noted,

> We emphasize, however, that our ruling in this case is confined to the statute of limitations issue before us. We express no opinion on the question whether a plaintiff who has filed a timely nuisance action is required to prove that abatement can be accomplished at a 'reasonable cost' in order to be entitled to an injunction requiring the wrongdoing party to remedy the damage to the property.

<u>Id.</u>  Because MC does not challenge the timeliness of WCM's nuisance action, WCM need not prove that abatement can be accomplished at a reasonable cost in order to pursue its continuing nuisance claim.

MC also argues that WCM's negligence claims fail because MC did not owe any duty to WCM.  "No person is permitted by law to use his property in such a manner that damage to his neighbor is a foreseeable result."  <u>Booska v. Patel</u>, 24 Cal. App. 4th 1786, 1791

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(1994).  Whatever rights MC has in the management of its own land, those rights are tempered by its duty to act reasonably.  Id. Here, MC had a duty not to act in a way that would potentially release PCE onto WCM's property.  Proffering evidence that MC drilled a slant boring from the MC property to the WCM property is one way WCM can prove a breach of that duty.

MC argues in the alternative that WCM's negligence claims fail because its damages are speculative.  "Whatever the proper measure of damages may be, in a given case, the recovery therefor is still subject to the fundamental rule that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery."  Frustuck v. City of Fairfax, 212 Cal. App. 2d 345, 367-68 (1963).  MC asserts that WCM has admitted that it cannot prove its damages.  Warner Dep. 238:18-140:4.  However, the deposition testimony on which MC relies does not state as much. In that testimony, WCM's expert stated that he could not determine exactly how much the PCE levels in the soil and groundwater have increased over time.  He was only able to test current PCE levels. These statements do not show that WCM will not be able to prove its damages.  Therefore, even though WCM has not specified the exact amount of damages it seeks, it has clearly established the fact of damages and has carried its burden to show that its damages are not speculative.

MC argues that WCM's claim for strict liability fails because no admissible evidence suggests that MC engaged in any reckless or ultrahazardous activities.  MC relies on Lussier v. San Lorenzo Valley Water Dist., 206 Cal. App. 3d 92 (1988).  In that case, after a large storm, water overflowed from a creek on the

27

United States District Court
For the Northern District of California

plaintiff's land and damaged his house.  Id. at 98.  The plaintiff
sued the local water district based on strict liability, claiming
that the flooding was caused by the district's failure to clear
debris out of the creek.  The court held that the defendant could
not be strictly liable for damages that arose when a natural
condition of the defendant's land interfered with the plaintiff's
free use and enjoyment of his property.  Id. at 101.  The court
noted, "Obviously, owning land and letting nature take its course
thereon is not reckless or ultrahazardous activity."  Id. at 103
n.7.  The facts of the present case are starkly different.  PCE
does not naturally occur on anybody's land.  Further, WCM has
presented evidence that MC released PCE onto WCM's property through
slant boring.  Therefore, MC has failed to meet its summary
judgment burden on WCM's strict liability claim.

MC moves for summary judgment on WCM's equitable indemnity
claim because "most courts that have considered this issue have
concluded that CERCLA provides an adequate remedy at law."  Req'l
Airport Auth. of Louisville v. LFG, LLC, 460 F.3d 697, 711-12 (6th
Cir. 2006).  The Ninth Circuit is not among the "most courts" cited
in Req'l Airport Auth.

Section 9652(d) of CERCLA provides, "Nothing in this chapter
shall affect or modify in any way the obligations or liabilities of
any person under other Federal or State law, including common law,
with respect to releases of hazardous substances or other
pollutants or contaminants."  MC does not present the Court with
any state law that would bar an action for equitable indemnity
under these circumstances.  WCM only seeks equitable indemnity to
the extent that equitable relief under CERCLA is not available.

28

1   Therefore, the Court denies MC's summary judgment motion on this

2   claim.

3                              CONCLUSION

4       For the foregoing reasons, the Court grants in part WCM's

5   motion for partial summary judgment (Docket No. 30), thereby

6   adjudicating MC's third party affirmative defense under

7   § 9601(b)(3) and its claim for contribution under the Porter-

8   Cologne Act.  The Court grants in part MC's motion for partial

9   summary judgment (Docket No. 63), thereby adjudicating WCM's claim

10  for contribution under the Porter-Cologne Act.  All other claims

11  survive these summary judgment motions.

12      IT IS SO ORDERED.

13

14  Dated: 4/16/09

                                    _____
15                                  CLAUDIA WILKEN
                                    United States District Judge
16

17

18

19

20

21

22

23

24

25

26

27

28