IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALNUT CREEK MANOR, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>MAYHEW CENTER, LLC; and DEAN DUNIVAN,<br><br>    Defendants.<br>_____<br>MAYHEW CENTER, LLC; and DEAN DUNIVAN<br><br>    Cross-Claimants,<br><br>  v.<br><br>WALNUT CREEK MANOR, LLC,<br><br>    Cross-Defendant.<br>_____/ | No. C 07-5664 CW<br><br>ORDER FOR FURTHER BRIEFING ON DEFENDANTS' MOTION FOR A NEW TRIAL; DENYING DEFENDANTS' MOTION TO AMEND OR ALTER ORDER ON REMAINING CAUSES OF ACTION; AND DENYING DEFENDANTS' MOTION TO STAY EXECUTION OF JUDGMENT WITHOUT BOND |

Defendants Mayhew Center, LLC (MC) and Dean Dunivan[1] have filed motions for a new trial, to amend or alter the Court's October 2, 2009 Order on the non-jury causes of action and to stay the judgment without bond pending disposition of post-trial motions and appeal. Plaintiff Walnut Creek Manor (WCM) opposes the motions. The motions were heard on December 3, 2009. Having

---

[1] Hereinafter, the Court refers to Mayhew Center, LLC and Dean Dunivan collectively as MC.

considered all of the parties' papers and oral argument, the Court defers ruling on MC's motion for a new trial and orders further briefing.  The Court denies MC's motion to amend or alter the Court's October 2, 2009 Order on the non-jury causes of action, and denies MC's motion to stay the execution of judgment without bond.

## BACKGROUND

On June 1, 2009, a jury returned a verdict in favor of WCM against MC on claims on negligence, ultrahazardous activity, trespass and nuisance.  The verdict included awards of $350,000 for past damages and $1.597 million for future damages.

On October 2, 2009, the Court ruled in favor of WCM and against MC on the remaining non-jury claims under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the California Hazardous Substance Account Act (HSAA).  The Court concluded that the MC property is the source, and that the WCM property is not the source, of all PCE contamination on WCM and MC property.  The Court also concluded that MC is 100 percent liable for any future response costs that will be necessary and consistent with the national contingency plan.  On October 2, 2009, the Court entered judgment for WCM and against MC on all claims.

WCM now challenges the jury's verdict and the Court's October 2 Order.

## DISCUSSION

I. Motion for a New Trial

"The trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."

2

Shimko v. Guenther, 505 F. 3d 987, 993 (9th Cir. 2007).

    A.    Jury Verdict on Negligence, Ultrahazardous Activity and Trespass Causes of Action

        1.    Negligence

MC argues that it was not negligent because it could not have abated the soil contamination any earlier without the Water Board's approval. MC does not provide any legal authority for the proposition that a Water Board investigation suspends a property owner's duty of care to its neighbors. Although the Board had not approved an abatement or remediation plan for the MC property by the time of trial, MC did not present any evidence that it was unable to investigate and take reasonable steps to protect against harm to the WCM property upon learning of the PCE contamination.

Further, WCM presented extensive evidence to support the jury's finding that MC's conduct fell below the standard of care. "MC has a duty not to act in a way that would potentially release PCE onto WCM's property." Walnut Creek Manor, LLC v. Mayhew Center, LLC, 622 F. Supp. 2d 918, 934 (N.D. Cal. 2009). MC breached this duty in several ways. For instance, MC (1) did not conduct any approved, licensed soil or groundwater sampling of the property; (2) was aware almost a year before the Board's first regulatory investigation request that a Phase 1 environmental report indicated that the PCE source could be at MC, but did not take any corrective action; and (3) drilled a slant boring that created a preferential pathway for contaminants to travel from MC property onto WCM property.

MC's failure to take reasonable actions in response to the PCE problem resulted in the migration of PCE from the MC property onto

3

the WCM property.  MC failed to rebut this evidence at trial and has not proved that the jury verdict is contrary to the clear weight of the evidence.

        2.    Ultrahazardous Activity and Trespass Claims

MC argues that the verdicts on these causes of action should be set aside because (1) no evidence supports the conclusion that the slant boring actually encroached onto WCM property and (2) the slant boring did not increase remediation costs.  The evidence at trial does not support these arguments.

MC makes much of Mr. Dunivan's trial testimony that he did not "know for a fact" that his slant boring went onto the WCM property; he only "assume[d]" it did.  Trial Test. at 1079-1080.  However, at trial, WCM also introduced Mr. Dunivan's prior deposition testimony in which he admitted that he "drilled from [MC] property and then onto Walnut Creek Manor's property."  Trial Test. at 1121-23. Further, in a letter to the Water Board, Mr. Dunivan's lawyer stated that the slant boring went onto WCM property; and during trial, Mr. Dunivan testified that this letter was "accurate in every sense."  Trial Test. at 1121.

Evidence at trial also supported the jury's finding that the slant boring was a substantial factor in causing harm to WCM. WCM's expert testified that the slant boring created a pathway for contamination to travel from the MC property onto the WCM property. Trial Test. at 569-571; 638.  And, after the boring, other soil testing revealed PCE on WCM property near the area where the slant boring had been drilled.  The jury could reasonably have inferred that this PCE was present as a result of the slant boring.

//

4

B. Joint and Several Liability

MC argues that the jury instruction concerning MC's liability deprived Mr. Dunivan of a fair trial because the instructions did not inform the jury that Mr. Dunivan would be held jointly and severally liable with the MC entity. The relevant instruction states:

> Under the law, a limited liability company (LLC) such as Walnut Creek Manor and Mayhew Center is considered to be a person. It can only act through its employees, agents and members. Therefore, Walnut Creek Manor and Mayhew Center are responsible for the acts of their employees, agents and members.

During trial, the parties engaged in the following colloquy.

| | |
|---|---|
| Mr. Blum:[2] | Your honor, the jury -- the verdict form could just say "Mayhew Center." |
| The Court: | Right. But I need to know what you just agreed to in case there is a dispute. |
| Mr. Blum: | We agree as to the claim for continuing nuisance, that should the jury find in favor of the plaintiffs on that, that the verdict will only be against Mayhew Center. And as to the other claims, it will be jointly and severally against Mayhew Center and Mr. Dunivan. |
| The Court: | The jury doesn't need to know that. That is just your side agreement. |
| Mr. Blum: | Yes, Ma'am. |
| Mr. Kelly:[3] | I agree with that, your honor. |

Trial Test. at 1102. Thus, the parties stipulated that the jury did not need to decide the allocation of liability as between MC and Mr. Dunivan.

A party may assign error to "a failure to give an instruction,

---

[2] Mr. Blum was MC's attorney.

[3] Mr. Kelly is WCM's attorney.

5

if that party properly requested it and -- unless the court rejected the request in a definite ruling on the record -- also properly objected." Fed. R. Civ. P. 51(d)(1)(B). MC failed to follow this procedure. MC's argument now seems to be that if the jury had known that Mr. Dunivan personally would be jointly and severally liable for the damages to WCM, sympathy for him might have reduced its verdict. This is not a legitimate consideration. When viewed along with the stipulation, the jury instructions and verdict form were proper and did not mislead the jury.

      C.    Jury Instructions and Verdict Form Consistency

MC argues that the jury instructions conflicted with the verdict form because the verdict form did not allow the jury to list damages specific for each cause of action. The Court instructed the jury that "damages for Walnut Creek Manor's negligence claim can only include damages for the harm that was caused specifically by Mayhew Center's negligence in failing to act more quickly to abate PCE contamination after it was discovered." The Court also instructed, "Damages for Walnut Creek Manor's ultrahazardous activity and trespass claims can only include damages for the harm caused specifically by the slant boring. You may award damages for ultrahazardous activity or trespass, but you may not award the same damages twice." The Court instructed that damages for the "nuisance [claim] may only include the amount of money Walnut Creek Manor has spent up to the time of trial in investigating the contamination."

The verdict form asked the jury to address WCM's causes of action in the following order: negligence, ultrahazardous activity, trespass and nuisance. The jury found MC liable for negligence and

awarded $350,000 in past damages and $1,597,000 in future damages. After the jury then found MC liable for the ultrahazardous activity of slant boring, it was asked, "What are Walnut Creek Manor's damages resulting from Mayhew Center's ultrahazardous activity, if any?" However, the form noted, "If you have already awarded these damages in answer to [the negligence damages question], do not award them again." The jury did not enter a damages amount for the ultrahazardous activity claim.

After the jury found MC liable for trespass for the slant boring, it was asked, "What are Walnut Creek Manor's damages resulting from Mayhew Center's trespass, if any?" The form again noted, "If you have already awarded these damages in answer to [the negligence or ultrahazardous activity damages questions], do not award them again." The jury did not enter a damages amount for the trespass claim either. Finally, after the jury found MC liable for nuisance, it was asked, "What are Walnut Creek Manor's damages resulting from Mayhew Center's nuisance, if any?" Just as with the previous causes of action, the form stated, "If you have already awarded some (or all) of these damages in answer to [the negligence, ultrahazardous activity or nuisance damages questions], do not award them again." The jury left this damages award blank as well.

There was no conflict between the instructions and the verdict form. The jury determined that no additional or new damages should be awarded for the slant boring, trespass or nuisance that were not already awarded under the negligence claim. Thus, there was no need for the jury to record separately the damages resulting from the slant boring, trespass or nuisance.

7

D. WCM's Opening and Closing Statements

MC argues that it was deprived of a fair trial because WCM's counsel misrepresented evidence during his opening and closing statements. The jury was instructed that these statements were not evidence and the Court concludes that no representations made by WCM's counsel during his opening and closing statements prejudiced MC. MC was afforded a fair trial and the evidence presented at trial supports the jury's verdict.

E. Damages Award

MC argues that the Court should order a new trial because the damages award in this case was erroneous. MC argues that the future damages award of $1.597 million is excessive. However, this figure is supported by the evidence presented at trial. WCM's expert Scott Warner testified that the remediation of the contaminated soil on WCM property, and the limited removal of the immediately adjacent soil source on MC property, would cost this amount. Removal of the contamination on MC property is necessary to prevent the problem from recreating itself on the WCM property. MC did not present any evidence to contradict this point.

MC asserts that the damages award is unlawful because Warner's remediation estimate was based on residential standards, as opposed to commercial standards, for waste abatement. MC did not raise this argument during trial and MC offers no evidence to rebut Warner's explanation that "because a portion of the affected property is residential, we likely will have to go to residential standards." Warner Trial Test. at 580:24-25.

MC also contends that WCM's future damages award is speculative because it depends on the action of a third party --

the San Francisco Bay Area Regional Water Quality Control Board (Water Board). Yet the resulting property damage from MC's contamination exists independently from any Board action. The evidence presented at trial regarding diminution of property value depended on the real estate market, not on any action taken by the Water Board. In fact, MC's own expert testified that a reasonable estimate of the diminished value of the property due to PCE contamination was sixty percent. MC's expert testimony could also provide evidence of WCM's diminished value.

MC asserts that the jury award, combined with the Court's ruling on the CERCLA issues, constitutes a double recovery for WCM. However, the Court has not awarded any CERCLA response costs and cannot award any such costs that would duplicate the jury's future damage award. Title 42 U.S.C. § 9614(b) provides: "Any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter." Therefore, the damages WCM received in tort may not also be recovered as CERCLA response costs.

However, the future damages award may constitute a double recovery depending on the Water Board's future actions. The Water Board is currently investigating the PCE contamination on the WCM and MC properties to determine what type of remediation plan to order, if any. The jury awarded WCM $1.597 million for future damages, which included "the reasonable cost [WCM] will have to spend to repair the harm in the future and the reduction in the value of [WCM's] property even after the repair." Final Jury

Instruction at 11. If the Water Board orders MC to remediate the WCM property, and it does so, as well as pays the full future damages award, this could constitute an impermissible double recovery. See Tavaglione v. Billings, 4 Cal. 4th 1150, 1159 (1993) ("Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited."). The Court will order further briefing on this point.

MC also argues that the damages award to WCM is inconsistent with public policy for three reasons. First, MC argues that the award contravenes the goals of CERCLA. However, a jury may award future damages for tortious injury to property even though future response costs are not allowable under CERCLA. For instance, in Stanton Road Assoc. v. Lohrey Enterprises, 984 F.2d 1015, 1021 (9th Cir. 1993), the Ninth Circuit rebuffed the defendant polluter's argument that CERCLA's proscription against future response costs also precluded relief from simultaneously brought state claims for negligence, nuisance and trespass. The court stated, "Lohrey contends that an award of monetary damages under state law is invalid because it would permit the plaintiff to circumvent the requirement under CERCLA that response costs be necessary and consistent with the national contingency plan. This argument is meritless." Id. CERCLA itself provides, "Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d). As noted above, CERCLA precludes a plaintiff from recovering cost of repair damages under both CERCLA and state law. 42 U.S.C. § 9614(b). Thus, the

express language of the statute defeats MC's contention that CERCLA preempts a state law recovery.

Second, MC argues that the damages award violates public policy because it interferes with the Water Board's investigation in this matter. Yet, California Water Code § 13002(e) provides: "No provision of this division or any ruling of the state board or a regional board is a limitation . . . [o]n the right of any person to maintain at any time any appropriate action for relief against any private nuisance as defined in the Civil Code or for relief against any contamination or pollution." Moreover, "Courts have long held that the Water Boards' administrative authority, while extensive, does not displace the court's own substantial jurisdiction to declare nuisances and grant damages to injured property owners." People v. Kinder Morgan Energy Partners, 569 F. Supp. 2d 1073, 1079 (S.D. Cal. 2008) (citing People v. City of Los Angeles, 160 Cal. App. 2d 494, 325 (1958)). Even "when a plaintiff's claims and a Regional Board's order involve the same common events or facts, the Regional Board's right to govern remediation is not inconsistent with a plaintiff's right to prosecute their damage claims." Id. See City of Los Angeles, 160 Cal. App. 2d at 502 (holding that, despite the Regional Board's action, plaintiffs were able to maintain a nuisance cause of action). Thus, the fact that the Water Board has the power to order MC to remediate does not deprive the Court of the power to address the same acts.[4]

---

[4]To the extent that the Court relied upon evidence to which the parties objected, the objections are overruled. The Court did
(continued...)

11

Third, MC argues that the damages award contravenes public policy because it includes no assurance that, to the extent it was based on the cost of remediation, it will be used for that purpose. The Court is troubled by this. "[A]llowing recovery for future costs absent any binding commitment to incur these costs would leave no incentive to complete the cleanup." In re Dant & Russell, 951 F.2d 246, 250 (9th Cir. 1991). WCM proceeded on a continuing nuisance theory. It did not attempt to prove a permanent nuisance nor did MC argue that the nuisance was not abatable. Thus, the Court instructed the jury, "If you find Mayhew Center liable for nuisance, the Court will issue an order requiring Mayhew Center to abate the contamination on Walnut Creek Manor's property." Final Jury Instructions at 12. Neither party objected to this instruction, and both parties agreed that the Court would enter such an order if the jury found a nuisance, as it did. However, neither party has moved for such an order. The Court will order further briefing on this point.

II. Federal Rule of Civil Procedure 52

MC has separately moved, under Rule 52, to alter or amend the Court's findings in its October 2, 2009 Order on the remaining non-jury causes of action. This rule provides, "Findings of fact, whether based on oral or other evidence, must not be set aside

---

[4](...continued)
not rely on any inadmissible evidence in reaching its decision. To the extent the Court did not rely on evidence to which the parties objected, the objections are overruled as moot. The Court grants MC's motion to take judicial notice that the October 8, 2009 article "Industrial Park Source of Contamination at Pleasant Hill Retirement Community," was published online at contracostatimes.com, but not for the truth of the matters stated therein.

12

unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(5). The rule also notes that "the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly." Id. Rule 52(b). Rule 52 does not allow the parties to relitigate the issues.

As noted above, the October 2 Order resolved the remaining non-jury claims under CERCLA and HSAA in favor of WCM and against MC. The Court concluded that the MC property is the source, and that the WCM property is not the source, of all PCE contamination on WCM and MC property. The Court also concluded that MC would be 100 percent liable for any future response costs that would be necessary and consistent with the national contingency plan.

MC argues that the Court clearly erred by concluding that MC is responsible for response costs for all PCE contamination discovered on the WCM property. However, during trial, (and in support of this motion), MC did not present any evidence that the PCE detected on the WCM property came from anywhere but the MC property. MC does not support with any facts its allegation that there remains a yet-undiscovered PCE source.

As noted in the October 2 Order, extensive evidence presented at trial supports the finding that PCE was used at and came from the MC property. Further, the evidence at trial supported the finding that MC's failure to address the PCE problem resulted in the migration of PCE through the soil, which damaged and will continue to damage the WCM property. MC failed adequately to rebut this evidence at trial. Lastly, sufficient evidence at trial supported the findings that Mr. Dunivan drilled onto the WCM

property in the course of conducting his slant boring, and that the boring created a pathway for contaminants to travel from the MC property to the WCM property.

In sum, the Court's October 2 Order does not contain incorrect findings of fact and conclusions of law. Accordingly, the Court denies MC's motion to amend or alter the judgment under Rule 52.

III. Motion to Stay Execution of Judgment

MC also separately moved under Federal Rule of Civil Procedure 62 for an order staying execution of, or any proceeding to enforce, the judgment entered in this case on October 2, 2009, and extinguishing any liens or levies purportedly established under California Code of Civil Procedure sections 448.480, 448.674 or 700.190, pending the disposition of all post-trial motions and appeals that have been or may be made in this case.

Under Rule 62(a), the execution or enforcement of a judgment is automatically stayed for fourteen days after entry of the judgment. After this automatic stay, the Court may continue the stay during the pendency of various post-judgment motions and appeals. Fed. R. Civ. P. 62(b), (d).

To stay execution of judgment, a supersedeas bond is normally required. See Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc. 600 F.2d 1189, 1191 (5th Cir. 1979); Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1505 n.1 (9th Cir. 1987) ("The purpose of a supersedeas bond is to secure the appellees from a loss resulting from the stay of execution and a full supersedeas bond should therefore be required."). "The posting of a bond protects the prevailing plaintiff from the risk of a later uncollectible judgment and compensates him for delay in

14

the entry of the final judgment." National Labor Relations Board v. Westphal, 859 F.2d 818, 819 (9th Cir. 1988).

The Court has discretion to stay execution of judgment without requiring a bond. See Federal Prescription Serv. v. American Pharmaceutical Ass'n, 636 F.2d 755, 759-61 (D.C. Cir. 1980) (Rule 62 "in no way necessarily implies that filing a bond is the only way to obtain a stay"); Northern Indiana Public Service Co. v. Carbon County Coal Co., 799 F.2d 265, 281 (7th Cir. 1986) (district court has discretion to waive $2 million appeal bond).

MC argues that posting a full bond would impose an undue financial burden. MC must "objectively demonstrate" the reasons the Court should "depart from the usual requirement of a full security supersedeas bond to suspend the operation of an unconditional money judgment." Poplar Grove, 600 F.2d at 1191. Because MC has not offered any evidence of the financial status of Mayhew Center, LLC or of Mr. Dunivan, it has failed to carry this burden. Therefore, MC will be required to post a bond to stay the execution of judgment.

MC argues that, in lieu of a supersedeas bond, the Court should allow MC to post an alternate form of security -- the MC property. A lien on the MC property, the source of the PCE, is not adequate security for the judgment awarded to WCM. MC claims that, in December, 2008, the MC property was appraised at $7 million, but it is not clear that this appraisal is reliable, given the subsequent economic downturn in the real estate market. Further, the MC property is already encumbered with a $3 million lien. Thus, any lien provided to WCM would be in second position at best. If MC is unable to pay the judgment against it and is forced to

give up the MC property, the primary lien-holder, the bank, will likely be motivated to sell the property for the amount necessary to recover its outstanding loan principal and accrued interest and costs. There is no guarantee that, even if the bank were able to accomplish this, WCM would be able to collect on its lien. Therefore, the Court rejects MC's request to allow it to post the MC property as an alternative form of security. The Court will exercise its discretion to stay the execution of judgment pending post-judgment motions and appeal only if MC posts adequate security.

## CONCLUSION

As noted above, it was the intention of the Court and the parties that, if the jury found a nuisance, the Court would order abatement. Abatement would be in the public interest. Any abatement would have to be consistent with the requirements of the Water Board's findings and orders. Neither party has proposed an abatement order, or addressed how one could be entered before the Water Board issues its order. Entry of judgment may have been premature in that no order of abatement has entered. The Court may need to vacate the judgment for this purpose.

However, the need for an order of abatement implicates MC's complaint of double damages, and raises practical problems. The jury's award of future damages included both future remediation and the diminution in value of the property even after remediation. Thus, it may be that the cost of remediation, at least in part if not in full, should be paid from the $1.597 million damage award, and the remainder should compensate WCM for the diminution in value of its property. It is not clear how this can be accomplished.

16

The Court is unaware of the status and likely timing of the Water Board's investigation. An order of abatement would presumably be addressed to MC, but it may be preferable for WCM to contract for the work. Neither party has addressed whether any response costs would be incurred under CERCLA, consistent with the National Contingency Plan, and, if so, how they would be paid.

The Court defers decision on MC's motion for a new trial (Docket No. 183), and orders further briefing addressing these issues and proposing solutions. For example, judgment could be vacated and MC could post a bond, or pay $1.597 million into an escrow account, pending the Water Board's decision as to how the MC and WCM properties are to be remediated. Guided by the Water Board's decision and the parties' briefing on any CERCLA and National Contingency Plan requirements, the Court could issue an abatement order. Judgment could then be re-entered. The remediation could proceed and any appeal could be filed. The remediation could proceed pending appeal. Any portion of the $1.597 million remaining after the remediation would be distributed to WCM to compensate for the reduction in the value of its property even after the repair, unless the case was reversed on appeal.

By March 1, 2010, the parties shall meet and confer to discuss these issues. By March 5, 2010, the parties shall submit a joint statement as to any issues upon which they may be able to agree. As to the issues upon which the parties disagree, they shall submit briefs according to the following schedule: by March 12, WCM shall file a brief addressing the disputed issues. It may propose a different course of action that addresses the Court's concerns. By March 26, MC shall file an opposition and its proposed course of

action.  By April 2, WCM shall file a reply and by April 9, MC shall file a surreply.  The matter will be heard on April 22, 2010 at 2:00 p.m.

The Court denies MC's motion to amend or alter the Court's October 2, 2009 Order on the non-jury causes of action (Docket No. 185), denies MC's motion to stay the execution of judgment without bond (Docket No. 189), and grants MC's motion for judicial notice (Docket No. 220).

IT IS SO ORDERED.

Dated: 02/22/2010

CLAUDIA WILKEN
United States District Judge